# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                                    No. CR 11-0543 JB

TAYDE HERNANDEZ,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's Appeal for the Magistrate's Detention Order (Doc. 13), filed March 2, 2011 [Doc. 13], filed March 2, 2011 (Doc. 14)("Appeal"). The Court held a evidentiary hearing March 9, 2011.  The primary issues are: (i) whether the Confrontation Clause of the Sixth Amendment to the United States Constitution applies to detention hearings; and (ii) whether the Court should vacate the Magistrate Judge's Order of Detention detaining Defendant Tayde Hernandez, set bond, and release him to the third-party custody of his wife or brother with conditions of release.  The Court concludes that the  Confrontation Clause does not preclude hearsay testimony at detention hearings.  The Court further concludes that the United States has shown by a preponderance of the evidence that T. Hernandez is a flight risk and by clear-and-convincing evidence that he is a danger to the community.  The Court therefore denies his Appeal.

## <u>FACTUAL BACKGROUND</u>

The Pretrial Services report indicates that T. Hernandez is a naturalized citizen.  T. Hernandez contends that he is legitimately employed.  He has six siblings, and they and his parents

all reside in New Mexico.  T. Hernandez is married and has three daughters.  T. Hernandez' wife is Maria Meza-Hernandez.

The Court takes the following facts from Drug Enforcement Agency Agent Richard Stark's affidavit, which is attached the Criminal Complaint, filed February 23, 2011 (Doc. 1).  On February 2, 2011,  two Confidential Informants ("CI-1" and "CI-2") contacted Middle Rio Grande Valley Task Force Agents Clarence Davis and Frank Chavez regarding a possible two kilograms buy-bust from a subject known to CI-1 as T. Hernandez.  CI-1 stated that T. Hernandez is the owner of Mariscos Los Arcos restaurant located at 7900 Zuni S.E., Albuquerque, New Mexico.

CI-1 further stated that, on February 2, 2011, CI-1 told T. Hernandez, that CI-1 was in Albuquerque to purchase kilogram quantities of cocaine.  CI-1 stated to T. Hernandez that CI-1 had purchased one kilogram of cocaine, but still had funds to purchase two additional kilograms.  T. Hernandez told CI-1 to meet with him at the restaurant the following morning and that T. Hernandez would supply CI-1 with the two kilograms.

On February 3, 2011, Chavez and Davis met with CI-1 and CI-2.  Davis showed CI-1 a driver's license photograph of T. Hernandez.  CI-1 identified the person in the photograph as T. Hernandez.  Davis then provided CI-2 with a monitoring device.  Both CI-1 and CI-2 were searched, and the agents confirmed they had no money or contraband on them.  Both CIs were followed to 7900 Zuni S.E., where both CIs entered the restaurant.

Once inside the restaurant, agents heard CI-1 talking to an unknown female and asking for T. Hernandez.  The female stated that T. Hernandez had already left for the day.  The female contacted T. Hernandez via telephone and handed the phone to CI-1 who spoke to T. Hernandez.  Both CIs exited the restaurant and were followed to a pre-arranged location.  CI-1 stated that it spoke to T. Hernandez via telephone from inside the restaurant and that T. Hernandez said he was

in Los Lunas, New Mexico with his horses.  CI-1 said that T. Hernandez requested CI-1 to return to the restaurant tomorrow at 9:00 a.m. to discuss the transaction.  CI-1 said that T. Hernandez is very cautious and will not talk about narcotics over the phone.

On February 4, 2011, the agents met with CI-1 and CI-2, and again, both CI's were searched. No money or contraband were found on them.  Davis provided CI-2 with a monitoring device.  The agents then followed the CIs to 7900 Zuni S.E., Mariscos Los Arcos Restaurant.  Shortly thereafter, CI-1 and CI-2 left the business and were followed directly to a pre-arranged location, where both CIs were interviewed.

CI-1 and CI-2 stated T. Hernandez was in a white Chevrolet truck bearing New Mexico license plate LFT916 awaiting their arrival in the parking lot of the Mariscos Los Arcos Restaurant. An inquiry on LFT916 revealed the 2008 Chevrolet truck was registered to T. Hernandez or Maria Gustavo at 1651 Shadyside S.W. in Albuquerque.  CI-1 and CI-2 said that T. Hernandez was going to wait until 4:00 p.m. to get the drugs.  CI-1 told T. Hernandez that it had the money and asked if it could get the drugs by 4:00 p.m.  T. Hernandez said he would call CI-1 back at 1:00 p.m.

At approximately 12:30 p.m., CI-1 and CI-2 contacted Davis and told him that T. Hernandez had contacted CI-1 and requested a meeting.  The CIs told T. Hernandez they were at the Isleta Casino.  T. Hernandez told the CI-1 he would meet them at the casino.

At approximately 1:20 p.m., agents from the Middle Rio Grande Valley Task Force arrived at the Isleta Casino and established surveillance.  CI-2 told Davis that T. Hernandez was inside the casino meeting with CI-1.  Davis and Chavez met with CI-2 in the parking lot, and provided CI-2 with a monitoring/recording device.  CI-2 went back into the casino.  Agents located T. Hernandez' white 2008 Chevrolet truck parked unoccupied in the north parking lot, east of the portable security buildings.  Chavez was able to install a tracking device.

At approximately 1:35 p.m., Chavez and Davis observed CI-1 and CI-2 exiting the casino. Agents followed the informants to a pre-arranged location where Davis debriefed them. CI-1 and CI-2 said that T. Hernandez told them to meet at 6:00 p.m. at the Accessories Mexico and they would complete the deal. While the debriefing was occurring, another agent continued surveillance on T. Hernandez' truck and followed T. Hernandez when he left the casino; T. Hernandez drove to his residence, then to the Auto Zone on Isleta Blvd. S.W. in Albuquerque. T. Hernandez then returned to his residence at 1651 Shadyside S.W.

Middle Rio Grande Valley Task Force members conducted a briefing regarding the buy/bust which was to occur. The CIs were to drive to the Accessories Mexico located at 2723 Isleta Blvd. S.W. and contact T. Hernandez via cellular phone. The deal would possibly take place there in the parking lot as T. Hernandez had told both CIs earlier.

At approximately 4:00 p.m., CI-1 told Davis that T. Hernandez had just called, and requested CI-1 meet now and conduct the transaction. Agents conducted a second briefing with CI-1 and CI-2. CI-2 was given a monitoring device, and the CIs were told that once they saw the cocaine, they were to give a pre-determined bust signal. Both CIs were searched. No money or contraband were located. At approximately 5:05 p.m., Chavez directed CI-1 to contact T. Hernandez via cellular phone, which CI-1 did. T. Hernandez gave CI-1 directions to his residence located at 1651 Shadyside S.W., where the transaction would occur.

At approximately 5:08 p.m., agents followed CI-1 and CI-2 directly to 1651 Shadyside S.W. Agents observed both CIs walking towards the residence. Agents were monitoring the conversation from a field just east of 1651 Shadyside S.W. At approximately 513 p.m., CI-2 gave the pre-determined bust signal indicating the CIs had seen the cocaine. Agents drove to the residence and entered the back yard where T. Hernandez and both CIs were taken into custody. T. Hernandez

-4-

and the CIs were standing next to a maroon Ford Expedition. All four doors of the Ford Expedition were open.  An inquiry on the truck's license plate, FSS534, returned to a 2001 Ford Expedition registered to Rita Garcia and Linda Carreon at 4209 Comanche N.E. in  Albuquerque.  Agents then secured the residence at 1651 Shadyside S.W.  Located inside were two children and M. Hernandez.

Chavez and Davis interviewed T. Hernandez, who stated that the two subjects were looking at the Ford Expedition and possibly going to purchase the vehicle.  Davis asked T. Hernandez if there were any narcotics in the vehicle or his residence. T. Hernandez said "No."  T. Hernandez admitted to having several firearms.

Agents then spoke to CI-1, who stated the cocaine was under the front passenger seat of the Ford Expedition.  Chavez walked to the Ford Expedition and under the front passenger seat was a heat sealed plastic bag containing a white substance.  Chavez then obtained a State District Court search warrant for the residence, the maroon Ford Expedition, and the white Chevrolet truck that T. Hernandez was driving throughout the day.

Chavez and Davis interviewed M. Hernandez regarding her knowledge of drug trafficking. Davis translated Spanish to English.  M. Hernandez said that she has no knowledge of her husband's cocaine trafficking.  When questioned about their finances, M. Hernandez said that she is employed at Mariscos Los Arcos Restaurant along with her husband and that she does not get paid, because the restaurant is not making any money.  M. Hernandez was questioned about her husband and she stated that he does not collect a salary from the restaurant either.  M. Hernandez said that T. Hernandez also works at Carco, which is a car lot off Zuni S.E.

M. Hernandez was then questioned about numerous properties listed in her name in Valencia County, New Mexico.  M. Hernandez said they are vacant lots; 1/3 acres in size, which T. Hernandez purchased at an auction.  Agents located approximately twenty-five letters from the

association regarding the lot.  Agents then questioned M. Hernandez about her residence and another residence in her name located at Doty S.W.  M. Hernandez said that her house payments were around $1,000.00 a month and the other residence was M. Hernandez' parents.  M. Hernandez was not aware that the residence was in her name.

## PROCEDURAL BACKGROUND

On February 23, 2011, T. Hernandez was charged in a Criminal Complaint with possession with intent to distribute 500 grams and more of cocaine, in violation of 21 U.S.C. §§ 841 (a)(1) and (b)(1)(B).  See Doc. 1.  This charge carries a statutory minimum sentence of five years, with a statutory maximum sentence of forty years imprisonment.  See 21 U.S.C. § 841(b)(1)(B)(ii)(II).

The Pretrial Services Report indicates that T. Hernandez verified, and his wife corroborated, annual travel to Mexico and that their last travel Mexico was in 2009 to visit his M. Hernandez' family.  When United States Probation and Pretrial Officer Andrew Selph interviewed T. Hernandez and his sister, Emilia Hernandez, he asked T. Hernandez whether he had traveled outside of the United States, and, upon receiving a positive response, when he had last done so and for what purpose.  T. Hernandez responded that he visits his family in Sinaloa, Mexico approximately once a year.

On March 1, 2011, T. Hernandez filed a Waiver of Preliminary Examination or Hearing, see Doc. 11, but proceeded with a detention hearing.  See Clerks Minutes, filed March 1, 2011 (Doc. 12).  The Honorable W. Daniel Schneider, United States Magistrate Judge, held a detention hearing.  At the detention hearing, the Untied States alleged that T. Hernandez had failed to disclose approximately fourteen border crossings in 2009 and 2010 into the Republic of Mexico.  The Untied States did not provide information about T. Hernandez' border crossings at the initial setting on his detention.  The United States also alleged that T. Hernandez' family business restaurant is not a

-6-

legitimate business.  Judge Schneider, found, by a preponderance of the evidence, that T. Hernandez did not overcome 18 U.S.C. § 3142(e)'s rebuttable presumption that there is no condition or combination of conditions that will reasonably assure his appearance and the safety of the community.  Judge Schneider issued his Detention Order Pending Trial that same day.  See Doc. 13.

T. Hernandez requests that the Court, pursuant to "18 U.S.C. § 3142 et seq," set a bond and to release him to his wife's third-party custody.  Appeal at 1.  In his appeal, T. Hernandez indicates that he will clarify the border crossings during the appeal hearing.  T. Hernandez contends that he oftentimes accompanies his sister, E. Hernandez, to Juarez, Mexico for her monthly dental work.

On March 8, 2011, the United States filed its Response to Defendant's Appeal of Detention of Order.  See Doc. 16 ("Response").  The United States responds that the Court should affirm Judge Schneider's detention order.  It asserts that T. Hernandez cannot overcome the statutory presumption that T. Hernandez is a serious flight risk and a continuing danger to the community.

At the March 9, 2011 hearing, T. Hernandez conceded that the statutory presumption is present.  See Transcript of Hearing at 3:13-15 (taken March 9, 2011)(Gorence)("Tr.").[1]  He also permitted the Court to take notice of the facts in the Criminal Complaint and FBI Agent Richard Stark's testimony before Judge Schneider at the March 1, 2011 detention hearing.  See Tr. at 3:4-13 (Gorence).

T. Hernandez sister, E. Hernandez, who has lived in Albuquerque for approximately twenty years and became a naturalized citizen in about 1998, testified at the March 9, 2011 hearing that T. Hernandez accompanied her to dentist appointments in Juarez.  She stated that, for about three years she has traveled approximately monthly to Juarez -- where the orthodontic services are less

---

[1] The Court's citations to the transcript of hearings refers to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

expensive -- for dental service for her braces.  See Tr. at 9:4-10:17 (Gorence, E. Hernandez).  Her appointments last a "few hours," after which she returns to the United States.  Tr. at 11:3-7 (Gorence, E. Hernandez).  E. Hernandez stated that a male relative usually accompanies her on her trips to Juarez, because the escalation in violence makes the city dangerous.  See Tr. at 10:18-24, 14:15-23 (Gorence, E. Hernandez).  She further stated that she could not recall how many times T. Hernandez accompanied her, but that it was "a couple of times" and "a few times" in 2009 and 2010, but he has not accompanied her in 2011.  Tr. at 11:8-24 (Gorence, E. Hernandez); id. at 16:1-17:8 (Ramirez, E. Hernandez).  When they traveled to Juarez, they would drive, occasionally -- approximately twice -- taking separate cars when T. Hernandez had other things to do while E. Hernandez was at the dentist -- like getting candy or pinatas at the mercado.  See Tr. at 17:9-21:4 (Ramirez, E. Hernandez).  E. Hernandez testified that when they took separate cars, they would travel in tandem, "[o]ne car behind the other," and that they "were never separated."  Tr. at 19:16-20:13 (Ramirez, E. Hernandez).  E. Hernandez testified that T. Hernandez has also traveled to Juarez without her.  See Tr. at 14:24-15:4 (Gorence, E. Hernandez).

E. Hernandez testified about her interview with Pretrial Services.  She testified that she understood Selph to inquire about T. Hernandez' travel to Mexico to visit family.  See Tr. at 13:5-14:7 (Gorence, E. Hernandez).  She further testified that, based on that understanding, when she told Selph that T. Hernandez traveled to Mexico once a year, she did not account for T. Hernandez' other trips to Juarez.  See Tr. at 14:8-11, 15:5-10 (Gorence, E. Hernandez).

Jose Hernandez, T. Hernandez' brother, also testified at the March 9, 2011 hearing.  J. Hernandez, a naturalized citizen who has lived in Albuquerque since 1991, works at Intel Corporation as a process engineer.  See Tr. at 26:2-27:1 (Gorence, J. Hernandez).  J. Hernandez testified that he is close to T. Hernandez, that their family is close-knit, and that he regards him like

a father.  <u>See</u> Tr. at 27:2-28:11 (Gorence, J. Hernandez).  J. Hernandez further testified that T. Hernandez has three daughters and that he is close to them.  <u>See</u> Tr. at 27:2-28:21 (Gorence, J. Hernandez).  J. Hernandez lives in the house behind T. Hernandez and is willing to be T. Hernandez' custodian.  <u>See</u> Tr. at 33:6-22 (Gorence, J. Hernandez).  T. Hernandez requested that the Court also consider allowing J. Hernandez to be T. Hernandez' third-party custodian.  J. Hernandez stated that he did not know that T. Hernandez was selling drugs in the backyard -- which abuts his property.  <u>See</u> Tr. at 34:15-36:13 (Ramirez, J. Hernandez).

J. Hernandez presented records of property that T. Hernandez owns in Valencia County, New Mexico.  <u>See</u> Tr. at 29:1-20 (Gorence, J. Hernandez).  The records show that T. Hernandez purchased twenty-eight lots in 1997 for approximately $2700.00.  <u>See</u> Tr. at 29:14-30:2 (Gorence, J. Hernandez).  J. Hernandez testified that, although he has not seen the property, it is in the "boonies," that T. Hernandez has not developed the property, and that T. Hernandez pays taxes on the property.  Tr. at 29:21-30:9 (Gorence, J. Hernandez).  J. Hernandez also stated that he does not know if the property is in Los Lunas or Belen.  <u>See</u> Tr. at 36:13-37:4 (Ramirez, J. Hernandez).

J. Hernandez testified that he worked at the family business, Los Arcos Seafood Restaurant in Albuquerque, since 1994, when it opened.  <u>See</u> Tr. at 30:18-22 (Gorence, J. Hernandez).  Both E. Hernandez and J. Hernandez stated that T. Hernandez owns and manages the business.  <u>See</u> Tr. at 7:5-9:3 (Gorence, E. Hernandez); <u>id.</u> at 31:5-10 (Gorence, J. Hernandez).  J. Hernandez presented the 2009 Office of the Public Regulation Commission's Certificate of Incorporation of Marisco Los Arcos, Inc.  The certificate stated that the business was going to close on September 30, 2009.  <u>See</u> Tr. at 37:15-38:16 (Ramirez, J. Hernandez).  J. Hernandez stated that T. Hernandez also receives income from working part-time at a car dealership.  <u>See</u> Tr. at 31:11-32:3 (Gorence, J. Hernandez).  J. Hernandez does not know how T. Hernandez is paid from the restaurant or the dealership.  <u>See</u>

Tr. at 38:17-39:16 (Ramirez, J. Hernandez).

T. Hernandez agreed to allow the United States to proffer Stark's testimony. See Tr. at 40:20-24 (Gorence).  The United States proceeded by proffer of Stark's testimony from Judge Schneider's March 1, 2011 detention hearing.  The United States also proffered that Stark would testify that he pulled T. Hernandez' border crossing records for 2009 and 2010.  See Border Crossing Records for T. Hernandez, Government Exs. 1, 1A.  The records indicated that T. Hernandez has traveled to Mexico six times in 2010 and seven times in 2009, sometimes more than once per month.  The United States also proffered that Stark would submit E. Hernandez' border crossing records, and that a comparison of T. Hernandez' and E. Hernandez' records reveal that there is no correlation between their crossings in 2009, and only two of T. Hernandez' crossing correlate to E. Hernandez' crossings in 2010.  See Tr. at 42:14-43:8 (Ramirez); Border Crossing Records for E. Hernandez, Government Exs. 3, 4.  On the two dates where E. Hernandez and T. Hernandez both crossed, they were in separate lanes six and forty-two minutes apart.  See Tr. at 43:9-44:1 (Ramirez).  E. Hernandez indicated that her dental appointments always occur on a Saturday and that would be the days on which she would cross over.  Stark has confirmed on the calendar the dates of her crossings and that ten of the twenty-eight, did not occur on a Saturday.  See Tr. at 48:3-8.

The United States also proffered that Stark would testify that he requested T. Hernandez' Claimant Information from the New Mexico Department of Labor for 2000 to the present, and T. Hernandez cannot show any legitimate income since the second quarter of 2008.  See Tr. at 44:5-45:1 (Ramirez); Claimant Information, Government Ex. 2.  The United States proffered that Stark would testify that, when he attempted to obtain T. Hernandez' wife's border crossings, the system returned a response that her crossings were "too numerous to list."  Tr. at 45:9-16 (Ramirez).  The

United States also proffered that Stark would testify that ten firearms were retrieved from T. Hernandez' house, including four pistols and six rifles, including one assault rifle.  See Tr. at 45:17-46:2 (Ramirez).

United States Probation Officer Sandra Day also testified at the March 9, 2011 hearing.  She testified on Selph's behalf, who was out of state for training on the day of the hearing.  T. Hernandez objected that this hearsay violated his Confrontation-Clause rights.  See Tr. at 46:15-47:16 (Gorence).  Day testified that Selph's notes indicated that he asked T. Hernandez whether he had traveled outside of the United States, and, upon receiving a positive response, Selph asked when T. Hernandez had last done so and for what purpose.  See Tr. at 50:23-52:11.  According to Selph's notes, he asked T. Hernandez: "[W]hen was the last time you traveled to Mexico?"  Tr. at 52:5-11 (Ramirez, Day).  T. Hernandez answered that his last trip was to visit his mother's family around Christmas in 2009.  See Tr. at 52:5-11 (Ramirez, Day).  Day testified that Selph stated that he corroborated T. Hernandez' statements with two of his sisters and his brother, who also stated only that T. Hernandez traveled to Mexico in 2009 to visit family.  See Tr. at 52:21-24 (Ramirez, Day).  Day stated that Selph recommends detaining T. Hernandez pending trial in light of T. Hernandez' unreported travel to Mexico.  See Tr. at 59:9-11 (Gorence, Day); id. at 59:21-60:4 (Court, Day).  Nonetheless, Pretrial Service's recommendation continues to be that T. Hernandez be released on conditions pending trial.  See Tr. at 59:1-7 (Gorence, Day); id. at 60:5-13 (Court, Day).

## STANDARD OF REVIEW BY THE DISTRICT COURT

"The standard of review for the district court's review of a magistrate judge's detention or release order under § 3145(a) is de novo."  United States v. Cisneros, 328 F.3d 610, 616 n.1 (10th Cir. 2003).  "When the district court acts on a motion to revoke or amend a magistrate's pretrial detention order, the district court acts de novo and must make an independent determination of the

proper pretrial detention or conditions for release." United States v. Rueben, 974 F.2d 580, 585-86

(5th Cir. 1992).  See United States v. Maull, 773 F.2d 1479, 1481 (8th Cir.1985)(stating that a

district court's review of magistrate judge's order setting bond was de novo).

## STATUTORY PRESUMPTION AGAINST RELEASE

A statutory presumption arises "that no condition or combination of conditions will

reasonably assure the appearance of the person as required and the safety of the community if" a

court "finds that there is probable cause to believe that the person committed an offense for which

a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances

Act."  18 U.S.C. § 3142(e)(3).  See United States v. Villapudus-Quintoro, No. 08-2308, 2009 WL

141931, at *1 (10th Cir. Jan. 22, 2009)(recognizing that 18 U.S.C. § 3142(e) establishes a rebuttable

presumption favoring detention in the case of, among other defendants, certain alleged drug

offenders).

> Under section 3142(e), upon a finding of probable cause that the defendant has
> committed a federal drug offense carrying a maximum prison term of ten years or
> more, a rebuttable presumption arises that no conditions of release will assure
> defendant's appearance and the safety of the community.  Once the presumption is
> invoked, the burden of production shifts to the defendant.  However, the burden of
> persuasion regarding risk-of-flight and danger to the community always remains with
> the government.  The defendant's burden of production is not heavy, but some
> evidence must be produced.  Even if a defendant's burden of production is met, the
> presumption remains a factor for consideration by the district court in determining
> whether to release or detain.

United States v. Stricklin, 932 F.2d 1353, 1354-55 (10th Cir. 1991).

To determine whether the defendant has rebutted the presumption, the court must consider:

(i) the nature and circumstances of the crime charged; (ii) the weight of the evidence against the

defendant; (iii) the defendant's history and characteristics, including family ties, employment,

financial resources, community ties, drug or alcohol abuse history, and past conduct; and (iv) the

nature and seriousness of the danger to the community or to an individual that release would pose. See 18 U.S.C. § 3142(g). Should the defendant satisfy his burden of production, the United States must then show by a preponderance of the evidence that the defendant presents a risk of flight and by clear-and-convincing evidence that the defendant presents a danger to the community. See United States v. Mercedes, 254 F.3d at 436; United States v. Stricklin, 932 F.2d at 1354-55 ("[T]he burden of persuasion regarding risk-of-flight and danger to the community always remains with the government."). Notably, however, even if the defendant meets his burden of production, "the presumption remains a factor for consideration by the district court in determining whether to release or detain." United States v. Stricklin, 932 F.2d at 1355 (citation omitted). Accord United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). "The rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f).

**ANALYSIS**

Given the quantity of narcotics involved, the strength of the United States' evidence against T. Hernandez, and his ties to Mexico -- where he frequently travels and has family -- along with the material inconsistencies between T. Hernandez' border crossing records and his statements to Pretrial Services, a preponderance of the evidence supports finding that T. Hernandez is a flight risk. Clear-and-convincing evidence supports finding that T. Hernandez also poses a danger to the community, based on the statutory presumption and his participation in selling 500 grams and more of cocaine. Accordingly, the Court will order T. Hernandez detained pending trial.

**I.      THE CONFRONTATION CLAUSE DOES NOT APPLY TO DETENTION HEARINGS.**

At the March 9, 2011, T. Hernandez contended that he has a right to confront witnesses at

his detention hearing under the Sixth Amendment of the United States Constitution and that the Court therefore should not consider Day's testimony about the contents of Selph's notes.  The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  There is scant authority addressing the application of the Confrontation Clause to detention hearings following the Supreme Court of the United States' opinion in Crawford v. Washington, 541 U.S. 36 (2004), which established that, consistent with the Sixth Amendment, "[t]estimonial [hearsay] statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 541 U.S. at 59.  Before Crawford v. Washington, courts held that the Confrontation Clause did not attach to detention hearings.  Nothing in the Supreme Court's opinion in Crawford v. Washington undermines those holdings.  Moreover, what authority exists after Crawford v. Washington rejects the proposition that Crawford v. Washington applies outside of trial.  The Court, therefore, rejects T. Hernandez' contention that the Confrontation Clause applies to detention hearings.

> **A.**    **PRE-CRAWFORD V. WASHINGTON CASES HELD THAT THE CONFRONTATION CLAUSE DOES NOT ATTACH TO DETENTION HEARINGS.**

In cases before Crawford v. Washington, courts uniformly held that defendants do not have the right to confront witnesses at detention hearings.  In United States v. Smith, 79 F.3d 1208 (D.C. Cir. 1996), the United States Court of Appeals for the D.C. Circuit addressed the defendant's "argu[ment] that the district court's decision to permit the Government to proceed by proffer denied him procedural due process and his right under the Sixth Amendment to confront his accusers."  79 F.3d  1210.  The D.C. Circuit rejected the defendant's argument:

> A pretrial detention hearing, however, is neither a discovery device for the defense

nor a trial on the merits.  The process that is due is only that which is required by and proportionate to the purpose of the proceeding.  That purpose includes neither a reprise of all the evidence presented before the grand jury, United States v. Suppa, 799 F.2d 115, 119 (3d Cir. 1986), nor the right to confront non-testifying government witnesses, see, e.g., United States v. Accetturo, 783 F.2d 382, 388-89 (3d Cir. 1986); United States v. Winsor, 785 F.2d 755, 756-57 (9th Cir. 1986)]; United States v. Delker, 757 F.2d 1390, 1397-98 (3d Cir. 1985).  See also United States v. Hurtado, 779 F.2d 1467, 1479 (11th Cir. 1985) (purpose of pretrial detention hearing is not to "rehash . . . probable cause" but to provide opportunity for detainee to show no risk of flight or danger to community); United States v. Williams, 798 F. Supp. 34, 36 (D.D.C. 1992) (same).

We conclude that Smith was provided sufficient procedural safeguards to satisfy the constitutional requirements applicable to a proceeding directed at the question whether one whom the Government has probable cause to believe committed crimes of violence and a serious drug crime poses a danger to the community if allowed to remain at large until his trial.  Smith had representation by appointed counsel, the ability to testify (which he did), and the right to proffer the testimony of others in his own behalf (which he did not).  A right to require the Government to produce its witnesses against him would complicate the hearing to a degree out of proportion to the liberty interest at stake -- viz. the interest in remaining free until trial, for what is by statute a period of limited duration.  See Speedy Trial Act, 18 U.S.C. § 3161 et seq.

79 F.3d at 1210.

Likewise, in United States v. Pasciuti, 958 F.2d 361 (1st Cir. 1992), the United States Court

of Appeals for the First Circuit rejected a defendant's "claimed constitutional right to confront

witnesses at a detention hearing":

Section 3142(f) of title 18 states that at a detention hearing the defendant shall be afforded an opportunity to testify, to present witnesses, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise.

. . . .

Courts have concluded that district courts have much discretion in determining whether a bail hearing shall be conducted by proffer or live testimony and have rejected the contention that either the constitution or § 3142(f) necessarily requires that live witnesses be produced at detention hearings.  See United States v. Cardenas, 784 F.2d 937, 938 (9th Cir. 1986) (rejecting contention that due process requires a defendant at a detention hearing to be afforded the right to confront and

-15-

cross-examine witnesses; government may proceed by proffer); <u>United States v. Hurtado</u>, 779 F.2d 1467, 1479-80 (11th Cir. 1985) (judicial officer has discretion to prevent detention hearings from becoming full-blown trials, but should exercise discretion with recognition that pretrial detention may restrict liberty for a significant time); <u>United States v. Delker</u>, 757 F.2d 1390, 1395-98 (3d Cir. 1985) (rejecting contention that § 3142(f) gives to defendants the choice whether to proceed by proffer or witnesses and concluding instead both that the section confers discretion on the district court to choose the mode of proceeding and that due process does not preclude using hearsay or mandate subpoenaing witness whose out-of-court statements are used to link defendant to criminal offenses).

958 F.2d 361, at * 5.

Similarly, in <u>United States v. Delker</u>, 757 F.2d 1390 (3d Cir. 1985), the United States Court

of Appeals for the Third Circuit rejected a defendant's argument that

while hearsay testimony may be used in a detention hearing for certain purposes, such as describing prior acts or the present conduct of the accused, hearsay may not be employed to demonstrate that appellant committed the crime with which he is charged.  There is, he maintain[ed], a due process right to confront those witnesses whose testimony is adverse and material concerning the crimes charged in an indictment.

757 F.2d at 1397-98.  The Third Circuit held that a defendant does not have a right to confront

witnesses at a detention hearing:

In several cases the Supreme Court has held that not every potential loss of liberty requires the full panoply of procedural guarantees available at a criminal trial. <u>E.g.</u>, [<u>Morrissey v. Brewer</u>, 408 U.S. 471, 481 (1972)]; <u>see</u> <u>also</u> <u>Gerstein v. Pugh</u>, 420 U.S. 103 (1975).

In <u>Gerstein</u> the Supreme Court considered the requisite procedures for a probable cause determination hearing following a warrantless arrest.  The issue at such a hearing "is whether there is probable cause for detaining the arrested person pending further proceedings." <u>Id.</u> at 120 . . . .  The Court held that "the full panoply of adversary safeguards-counsel, confrontation, cross-examination, and compulsory process . . . are not essential." <u>Id.</u> at 119-20 . . . .  The probable cause determination, declared the Court, although it may result in a temporary loss of liberty, "traditionally has been decided by a magistrate in a nonadversary proceeding on hearsay and written testimony, and the Court has approved these informal modes of proof." <u>Id.</u> at 120 . . . .

The District of Columbia Court of Appeals in <u>Edwards</u> reasoned that

identical interests were at stake in a Gerstein preliminary hearing and a pretrial detention hearing. "The effect of the findings in a detention hearing and a preliminary (Gerstein) hearing is the same: each hearing determines whether the accused may be detained pending trial. The individual's liberty interest affected by each proceeding is accordingly the same." 430 A.2d at 1336. We believe this analysis to be sound.

Appellant seeks to analogize his situation to that in Morrissey v. Brewer, 408 U.S. 471 . . . (1972), which involved a parole revocation hearing. In some respects the Court in Morrissey required greater procedural protections than those dictated in Gerstein. Nevertheless, it should be emphasized that in Morrissey, the Court held that a parole revocation hearing may be "informal" and that the right to confront and cross-examine witnesses was not absolute, but could be curtailed by the court if the witness would be subjected to risk of harm if his identity were disclosed, id. at 487 . . . , or if there is otherwise "good cause for not allowing confrontation." Id. at 489 . . . ; see also Gaynon v. Scarpelli, 411 U.S. 778, 784 n.5 . . . (1973) (Court did not "intend to prohibit use where appropriate of the conventional substitutes for live testimony").

Moreover, as the Supreme Court noted when distinguishing Morrissey in Gerstein, the added protections afforded at a preliminary parole revocation hearing derive from the fact that the parole hearing -- unlike the pretrial detention hearing -- "serves the purpose of gathering and preserving live testimony," because the final parole revocation decision "frequently is held at some distance from the place where the violation occurred." 420 U.S. at 121 n.22 . . . . In addition, the Court distinguished the two situations on the basis that the "formal criminal process" following a pretrial detention decision offers more protection from initial error than do the procedures following a preliminary parole revocation hearing. Id.

We believe that the hearing challenged here should be governed by Gerstein standards, and thus the district court did not err in admitting hearsay at the hearing and in refusing to subpoena the witnesses whose out-of-court statements linked appellant to the conspiracy and other crimes.

757 F.2d 1397-98. See Pennsylvania v. Ritchie, 480 U.S. 480, 54 n.10 (1987)("[T]he Court normally has refused to find a Sixth Amendment violation when the asserted interference with cross-examination did not occur at trial."  (citing McCray v. Illinois, 386 U.S. 300, 311-313 (1967)(finding no Confrontation Clause violation where defendant was denied the chance to discover an informant's name at preliminary hearing to determine probable cause for arrest and search of defendant))); United States v. Clark, 68 F.3d 467, at *2 (5th Cir. 1995)("Appellant's

contention that the district court improperly admitted hearsay testimony [in violation of his Confrontation-Clause rights] is without merit.  As we have stated previously, hearsay testimony is admissible in a detention hearing."  (citing United States v. Trosper, 809 F.2d 1107, 1111 (5th Cir. 1987)); States v. Winsor, 785 F.2d at 756 ("[T]he government may proceed in a detention hearing by proffer or hearsay.  The accused has no right to cross-examine adverse witnesses who have not been called to testify."  (citing United States v. Delker, 757 F.2d 1390, 1397-98 (3d Cir. 1985)(other citations omitted)).

### B.    CRAWFORD V. WASHINGTON CONCERNED A DEFENDANT'S TRIAL RIGHTS.

In 2004, the Supreme Court in Crawford v. Washington addressed whether hearsay statements from witnesses not subjected to cross-examination could be introduced at trial if they bear "adequate 'indicia of reliability.'"  541 U.S. at 40 (quoting Ohio v. Roberts, 448 U.S. 56, 66 (1980)).  The Supreme Court held that "where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."  541 U.S. at 68-69.  In reaching its holding, the Supreme Court first considered the meaning of "witness against" in the Sixth Amendment, stating it could "mean those who actually testify at trial, those whose statements are offered at trial, or something in-between."  541 U.S. at 43 (citations omitted).  Finding the text of the Sixth Amendment did not resolve the question, the Court used historical analysis to discern the Sixth Amendment's original meaning.

The analysis in Crawford v. Washington addressed the protections afforded defendants at trial, and did not address the protections at pretrial proceedings.  The Supreme Court reviewed the history of the admission of out-of-court statements at trial, contrasting the civil law's permission of judicial officers examining witnesses in private with the common law's "tradition . . . of live

testimony in court subject to adversarial testing." 541 U.S. at 43 (citations omitted).  The Supreme Court noted that, in sixteenth and seventeenth century England, the courts adopted the civil-law procedure of reading pre-trial testimony into the transcript as evidence at trial.  See 541 U.S. at 43-44.  "The most notorious instances of civil-law examination occurred in the great political trials of the 16th and 17th centuries.  One such was the 1603 trial of Sir Walter Raleigh for treason." 541 U.S. at 44.  At Raleigh's examination before the Privy Council, allegations from Lord Cobham, Raleigh's alleged accomplice, were read from a letter to the jury.  See 541 U.S. at 44.  Raleigh, suspecting Cobham would recant, demanded he be allowed to confront Cobham.  The Judges refused, and Raleigh was sentenced to death.  See 541 U.S. at 44.

In the wake of Raleigh's examination, through "a series of statutory and judicial reforms, English law developed a right of confrontation that limited these abuses." 541 U.S. at 44.  These reforms included "requiring a prior opportunity for cross-examination as a matter of common law" before an unavailable witnesses' statement would be admitted at trial.  541 U.S. at 46 ("[B]y 1791 (the year the Sixth Amendment was ratified), courts were applying the cross-examination rule even to examinations by justices of the peace in felony cases.").

The Supreme Court also found that controversy surrounding the Colonies' use of examination practices at trial supported the proposition that the original understanding of the Confrontation Clause was that a defendant must be allowed to cross-examine a witness whose statement is admitted against him or her at trial.  The Supreme Court noted, for example, that "John Adams, defending a merchant in a high-profile admiralty case, argued: 'Examinations of witnesses upon Interrogatories, are only by the Civil Law.  Interrogatories are unknown at common Law, and Englishmen and common Lawyers have an aversion to them if not an Abhorrence of them." 541 U.S. at 48 (citations omitted).  The Supreme Court also noted that "[m]any declarations of rights

adopted around the time of the Revolution guaranteed a right of confrontation."  541 U.S. at 48

(citations omitted).  The Supreme Court further found support in the early state decisions.  See 541

U.S. at 48.  The Supreme Court stated that "the Framers would not have allowed admission of

testimonial statements of a witness who did not appear at trial unless he was unavailable to testify,

and the defendant had had a prior opportunity for cross-examination."  541 U.S. at 53 (emphasis

added).  The Supreme Court's historical analysis and holding in Crawford v. Washington thus

addressed a defendant's rights "at trial," and did not delve into the requirements of pre-trial hearings.

The Court therefore does not believe that Crawford v. Washington applies to detention

hearings.  Nothing in the language or holding of Crawford v. Washington suggests it applies to

detention hearings of other preliminary hearings.  Moreover, the Supreme Court has consistently

held that the Sixth Amendment is a trial right:

> The right to confrontation is basically a trial right.  It includes both the opportunity
> to cross-examine and the occasion for the jury to weigh the demeanor of the witness.
> A preliminary hearing is ordinarily a much less searching exploration into the merits
> of a case than a trial, simply because its function is the more limited one of
> determining whether probable cause exists to hold the accused for trial.

Barber v. Page, 390 U.S. 719, 725 (1968).  In Pennsylvania v. Ritchie, the Supreme Court held that

"the right to confrontation is a *trial* right" and "[n]ormally the right to confront one's accusers is

satisfied if defense counsel receives wide latitude at trial to question witnesses."  480 U.S. 39, 52

(emphasis in original)).  See California v. Green, 399 U.S. 149, 157 (1970)("[I]t is th[e] literal right

to 'confront' the witness at the time of trial that forms the core of the values furthered by the

Confrontation Clause . . . .").  Crawford v. Washington appears to leave these decisions undisturbed.

See Crawford v. Washington, 541 U.S. at 57 (citing approvingly California v. Green and Barber v.

Page).  Cf. Agostini v. Felton, 521 U.S. 203, 237 (1997)("[I]f a precedent of this Court has direct

application in a case, yet appears to rest on reasons rejected in some other line of decisions, the

Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (citation omitted)).

### C.     COURTS HAVE HELD THAT <u>CRAWFORD V. WASHINGTON</u> DOES NOT APPLY TO PRE-TRIAL HEARINGS.

While few courts have addressed the question, the courts that have reached the question have uniformly have held that <u>Crawford v. Washington</u> does not apply to pre-trial hearings. In <u>Peterson v. California</u>, 604 F.3d 1166 (9th Cir. 2010), the United States Court of Appeals for the Ninth Circuit held, as a matter of first impression, that the admission of hearsay evidence at a preliminary hearing does not violate the Confrontation Clause of the Sixth Amendment and rejected a defendants' argument that <u>Crawford v. Washington</u> "clearly applied the Sixth Amendment right to confrontation of witnesses to pre-trial proceedings." 604 F.3d at 1170. The Ninth Circuit reasoned that "the United States Supreme Court has repeatedly stated that the right to confrontation is basically a trial right." 604 F.3d at 1169. The Ninth Circuit further stated:

> We also note that both the Fifth and Seventh Circuits have held that there is no right to confront witnesses at a preliminary hearing before being required to stand trial. <u>See</u> <u>United States v. Andrus</u>, 775 F.2d 825, 836 (7th Cir. 1985) ("[T]he sixth amendment does not provide a confrontation right at a preliminary hearing."); <u>United States v. Harris</u>, 458 F.2d 670, 677-78 (5th Cir. 1972) ("There is no Sixth Amendment requirement that [defendants] also be allowed to confront [the witness] at a preliminary hearing prior to trial."). The <u>Andrus</u> court reasoned that the Sixth Amendment does not provide a right to confrontation at a preliminary hearing because "[t]he right to confrontation applies when the ability to confront witnesses is most important -- when the trier of fact determines the ultimate issue of fact." 775 F.2d at 836.
>
> Peterson contends that the reasoning of <u>Harris</u>, <u>Andrus</u>, and [<u>Whitman v. Superior Court</u>, 54 Cal. 3d 1063 (1991)] is no longer sound in light of <u>Crawford v. Washington</u> . . . , which Peterson contends "clearly applied the Sixth Amendment right to confrontation of witnesses to pre-trial proceedings." True, the hearsay challenged in <u>Crawford</u> was a tape-recorded statement to police made before trial. <u>Id.</u> at 38 . . . . What was at issue, however, was whether the Confrontation Clause was violated when the record of the statement was introduced *at trial*. <u>Id.</u> . . . Accordingly, <u>Crawford</u> does not affect the reasoning of <u>Harris</u>, <u>Andrus</u>, and

Whitman, or the Supreme Court cases holding that the Confrontation Clause is primarily a trial right.

For these reasons, we conclude that the admission of hearsay statements at a preliminary hearing does not violate the Confrontation Clause.

604 F.3d at 1169-70 (alterations in original)(footnotes omitted).  While the Ninth Circuit's opinion concerned a preliminary hearing, and not a detention hearing, its reasoning applies with equal force to the situation before the Court: the Sixth Amendment is a trial right and does not apply to pretrial proceedings.

While the Tenth Circuit has not addressed whether the Confrontation Clause applies to detention hearings after Crawford v. Washington, the Tenth Circuit has taken a limited view of Crawford v. Washington's reach, suggesting that it applies only at trial.  See United States v. Bustamante, 454 F.3d 1200, 1202 (10th Cir. 2006) ("Crawford concerned the use of testimonial hearsay statements at trial and does not speak to whether it is appropriate for a court to rely on hearsay statements at a sentencing hearing."  (emphasis added)).  See also United States v. Hargrove, 382 F. App'x 765, 778 (10th Cir. 2010)(noting Crawford v. Washington allowed certain testimony at trial from preliminary hearings "despite the fact '[a] preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial . . . because its function is the more limited one of determining whether probable cause exists to hold the accused for trial'" (quoting Barber v. Page, 390 U.S. at 725)(internal quotation marks omitted)(alterations in original)).  As the Court has previously noted, the Tenth Circuit has held Crawford v. Washington inapplicable to sentencing hearings.  "[T]he Tenth Circuit has stated: '[Crawford v. Washington] in no way suggests, however, that we must alter the standards of admissibility for hearsay evidence in sentencing proceedings.  Thus, our established rule on that subject remains unchanged in the wake of Crawford.'"  United States v. Mata, No. CR 05-2046 JB, 2006 WL 4079127 (D.N.M. May 2,

-22-

2006)(Browning, J.)(quoting United States v. Phillips, No. 04-6371, 2006 U.S. App. Lexis 3156, at *10-11 (10th Cir. February 8, 2006))(alterations in original).

The Tenth Circuit has also suggested that Crawford v. Washington does not apply to suppression hearings. In United States v. Garcia, 324 F. App'x 705 (10th Cir.), cert. denied, 130 S. Ct. 223 (2009), the Tenth Circuit addressed a defendant's contention that it was plain error for a district court to hold that the Confrontation Clause does not attach to a suppression hearing. At the suppression hearing, a detective testified about "statements made by the two women." 324 F. App'x at 707. The defendant did not object to the testimony at the suppression hearing, but argued on appeal that the women's statements were inadmissible hearsay under Crawford v. Washington. On plain error review, the Tenth Circuit suggested, without deciding, that the Confrontation Clause does not apply to suppression hearings after Crawford v. Washington:

> We need not resolve whether Crawford's protection of an accused's Sixth Amendment confrontation right applies to suppression hearings, because even if we were to assume this protection does apply, we would conclude that the district court's error cannot be adjudged "plain." . . .
>
> There is no binding precedent from the Supreme Court or this court concerning whether Crawford applies to pretrial suppression hearings. To the extent that we can divine clues from our case law concerning the resolution of this issue, they do not benefit Mr. Garcia. See United States v. Miramontes, 365 F.3d 902, 904 (10th Cir. 2004) (decided after Crawford, but without citing it, holding that "hearsay [testimony] is admissible at a hearing on a motion to suppress and should have been considered by the district court"); cf. United States v. Bustamante, 454 F.3d 1200, 1202 (10th Cir. 2006) ("Crawford concerned the use of testimonial hearsay statements at trial and does not speak to whether it is appropriate for a court to rely on hearsay statements at a sentencing hearing." (emphasis added)).
>
> Moreover, apparently few federal courts have squarely addressed the issue. See, e.g., United States v. Morgan, 505 F.3d 332, 338 (5th Cir. 2007) ("[T]he Fifth Circuit has not decided whether Crawford applies to pretrial proceedings and determinations . . . ."); Francischelli v. Potter, No. 1:03-CV-6091-ENV, 2007 WL 776760, at * 10 (E.D.N.Y. Mar. 12, 2007) ("[T]he Court can find no authority applying Crawford to a suppression hearing."). And Mr. Garcia can find little solace in the rulings of those courts that have definitively spoken. See, e.g., Washburn v.

> United States, No. 3:05-CV-774 RM, 2006 WL 3715393, at *4 (N.D. Ind. Dec. 14,
> 2006) (noting that Crawford's applicability to pretrial suppression hearings is "an
> issue of first impression" in the Seventh Circuit and finding that defendant's
> "reliance on Crawford is misplaced"); United States v. Thompson, No. 4:05CR00161
> HEA(AGF), 2005 WL 3050634, at *6 (E.D. Mo. Nov. 14, 2005) (rejecting
> Crawford's alleged applicability to a pretrial suppression hearing, noting "Crawford
> does not change the long-standing prior precedent that permits the use of hearsay in
> preliminary proceedings dealing with the admissibility of evidence").

324 F. App'x at 708-09.

Reasoning along the same lines as the Tenth Circuit's opinion in United States v. Garcia

leads the Court to conclude that Crawford v. Washington does not apply to detention hearings.  First,

there is no precedent from the Supreme Court or the Tenth Circuit whether Crawford v. Washington

applies to detention hearings.  The same "clues from [Tenth Circuit] case law concerning the

resolution of this issue . . . do not benefit" T. Hernandez.  Cf. United States v. Bustamante, 454 at

1202 (stating that Crawford v. Washington applied to statements at trial and not at a sentencing

hearing).

"Moreover, apparently few federal courts have squarely addressed the issue.  And [T.

Hernandez] can find little solace in the rulings of those courts that have definitively spoken." United

States v. Garcia 324 F. App'x at 709.  In United States v. Bibbs, 488 F. Supp. 2d 925 (N.D. Cal.

2007), the United States District Court for the Northern District of California stated:

> Nothing in Crawford requires or even suggests that it be applied to a
> detention hearing under the Bail Reform Act, which has never been considered to be
> part of the trial.  Shortly after the Bail Reform Act was passed, the Supreme Court
> held that a detention hearing is not a "criminal prosecution" to which the Sixth
> Amendment applies.  See U.S. v. Salerno, 481 U.S. 739, 746-52 (1987) (emphasizing
> the regulatory purpose of pre-trial detention); see also U.S. v. Gebro, 948 F.2d 1118,
> 1121-22 (9th Cir. 1991) ("[T]he bail statute neither requires nor permits a pretrial
> determination of guilt."); U.S. v. Winsor, 785 F.2d 755, 756-57 (9th Cir. 1986)
> (defendant has no right to cross-examine adverse witnesses not called to testify in
> detention hearing); cf. U.S. v. Hall, 419 F.3d 980 (9th Cir. 2005) (Sixth Amendment
> does not apply to revocation hearing on supervised release).

Defendant has cited no authority (post-<u>Crawford</u> or otherwise), and I have found none, for the proposition that the Sixth Amendment right to confront witnesses applies in a detention hearing.  To the contrary two other judges of this court have ruled that <u>Crawford</u> did not alter the procedures for conducting detention hearings under the Bail Reform Act.  <u>See</u> <u>U.S. v. David Henderson</u>, CR 05-672 MHP (EMC) (Order of Detention Pending Trial, Docket No. 11); <u>U.S. v. Leonardo Henderson</u>, CR 05-609 JSW (ECL) (Order of Detention Pending Trial, Docket No. 12).  I therefore reject defendant's Sixth Amendment argument.

488 F. Supp. 2d at 926.  The Court agrees with the Northern District of California that nothing in

<u>Crawford v. Washington</u> suggests that it applies to a detention hearing.  <u>See</u> <u>United States v.</u>

<u>Bustamante</u>, 454 F.3d at 1202 ("<u>Crawford</u> concerned the use of testimonial hearsay statements <u>at</u>

<u>trial</u> and does not speak to whether it is appropriate for a court to rely on hearsay statements at a

sentencing hearing."  (emphasis added)).  <u>See also</u> <u>Pennsylvania v. Ritchie</u>, 480 U.S. at 54 n.10

("[T]he Court normally has refused to find a Sixth Amendment violation when the asserted

interference with cross-examination did not occur at trial.").  The Court therefore concludes that

<u>Crawford v. Washington</u> did not extend Confrontation-Clause protections to detention hearings.

T. Hernandez' argument that the Court may not consider hearsay testimony in his detention hearing

is thus unavailing.

## II.      THE STATUTORY PRESUMPTION IS PRESENT.

Probable cause exists to believe T. Hernandez possessed with intent to distribute 500 and

more grams of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B).  <u>See</u> Tr. at 3:13-15

(Gorence).  The United States presents evidence that T. Hernandez arranged to sell 500 grams and

more of cocaine, and that he negotiated a larger quantity.  Because probable cause exists to believe

T. Hernandez violated the statutory provisions -- which carry a minimum sentence of five years, and

a statutory maximum sentence of forty years imprisonment under 21 U.S.C. § 841(b)(1)(B)(ii)(II) --

a presumption arises "that no condition or combination of conditions will reasonably assure the

appearance of the person as required and the safety of the community."    18 U.S.C. §

3142(e)(3)(stating this presumption applies to Controlled Substances Act violations "for which a

maximum term of imprisonment of ten years or more is prescribed").  T. Hernandez waived his

preliminary hearing.  See Waiver of Preliminary Hearing or Examination, filed March 1, 2011 (Doc.

11).  At the April 1, 2011 hearing, T. Hernandez conceded that the statutory presumption is present.

See Tr. at 3:13-15 (Gorence).[2]  The Court therefore concludes that the statutory presumption is

present in this case.

### III.    THE COURT CONCLUDES THAT T. HERNANDEZ IS A FLIGHT RISK AND A DANGER TO THE COMMUNITY.

The Court concludes that T. Hernandez should be detained pending trial.  The United States

argues that T. Hernandez must be detained pending trial, because he is, by a preponderance of the

evidence, a flight risk, and, by clear-and-convincing evidence, a danger to the community.  The

United States contends that it presents strong evidence supporting a conviction under 21 U.S.C.

§ 841(a)(1) and (b)(1)(B), which would subject T. Hernandez to a lengthy term of incarceration.

Additionally, the United States argues, T. Hernandez has strong ties to Mexico and family that

resides there.  He also misrepresented the frequency of his travel to Mexico to Pretrial Services.  As

such, the United States contends, no condition or combination of conditions will adequately deter

T. Hernandez' flight and ensure the community's safety.

T. Hernandez asserts that he has strong ties to the community.  He is a long-term resident

of Albuquerque, where his parents, siblings, wife, and children reside.  He is a naturalized citizen.

He also has a business there that he owns and manages.  He further notes that, while ten firearms

---

[2] At the April 1, 2011 hearing, the United States stated that a grand jury has returned an indictment against T. Hernandez.  The indictment, however, does not appear in T. Hernandez' record.

were found at his house, a firearm offense is not alleged in the Criminal Complaint.

The Court concludes that T. Hernandez meets his burden of production in the face of the statutory presumption favoring detention.  See United States v. Stricklin, 932 F.2d at 1355 ("The defendant's burden of production is not heavy, but some evidence must be produced.").  While T. Hernandez has met his burden of production in response to the presumption, it "remains a factor for consideration by the district court in determining whether to release or detain."  United States v. Stricklin, 932 F.2d at 1355 (citation omitted).  The Court further concludes that the United States has shown, by a preponderance of the evidence, that T. Hernandez presents a risk of flight, and, by clear-and-convincing evidence, that he presents a danger to the community.  See United States v. Mercedes, 254 F.3d at 436; United States v. Stricklin, 932 F.2d at 1354-55 ("[T]he burden of persuasion regarding risk-of-flight and danger to the community always remains with the government.").  The Court also concludes that no conditions will adequately deter T. Hernandez' flight.  The Court is concerned that T. Hernandez would be released into the custody of his wife in the home where he is alleged to have trafficked drugs.  The evidence suggests that his wife did not have much control over T. Hernandez before his arrest, and the Court is not convinced that she would be able to exercise control upon his release.  At the hearing, T. Hernandez requested that the Court consider releasing him to his brother.  His brother, who lives behind T. Hernandez, was unaware of or unable to control T. Hernandez' drug related activities.  Additionally, the United States presents weighty evidence of T. Hernandez' guilt, and T. Hernandez has a strong incentive to flee to Mexico, to which he has ties and frequently travels, because he is facing a substantial sentence and deportation.

Moreover, T. Hernandez misrepresented the frequency of his travel to Selph.  T. Hernandez alleges that Selph asked him "if he spent significant time in Mexico."  Appeal ¶ 4, at 2.  Selph's

notes contradict T. Hernandez' allegation.   Selph's notes indicate that he asked whether T. Hernandez had traveled outside of the United States, and, upon receiving a positive response, when he had last done so and for what purpose.  <u>See</u> Tr. at 50:23-52:11.  According to Selph's notes, he asked T. Hernandez: "[W]hen was the last time you traveled to Mexico?"  Tr. at 52:5-11 (Ramirez, Day).  T. Hernandez answered it was to visit his mother's family around Christmas in 2009.  <u>See</u> Tr. at 52:5-11 (Ramirez, Day).  Selph corroborated T. Hernandez' statements with two of his sisters and his brother, who also stated only that T. Hernandez traveled to Mexico in 2009 to visit family.  <u>See</u> Tr. at 52:21-24 (Ramirez, Day).  The Court is concerned about T. Hernandez' failure to be forthcoming with Pretrial Services.  Additionally, T. Hernandez' and E. Hernandez' border crossing records contradict T. Hernandez' subsequent explanation he "oftentimes accompanies his sister, Emilia Hernandez to Juarez, Mexico for her monthly dental work."  Appeal ¶ 4, at 2.  The United States proffered that a comparison of T. Hernandez' and E. Hernandez' records reveal that there is no correlation between their crossings in 2009, and only two of T. Hernandez' crossings correlate to E. Hernandez' crossings in 2010.  <u>See</u> Tr. at 42:14-43:8 (Ramirez).  On the two dates where E. Hernandez and T. Hernandez both crossed, they were in separate lanes six and forty-two minutes apart, <u>see</u> Tr. at 43:9-44:1 (Ramirez), contradicting E. Hernandez assertion that they traveled in tandem, "[o]ne car behind the other," and that they "were never separated," Tr. at 19:16-20:13 (Ramirez, E. Hernandez).  The Court therefore "finds that no condition or combination of conditions will reasonably assure the appearance of [T. Hernandez] as required and the safety of any other person and the community, [the Court] shall order the detention of the [T. Hernandez] before trial."  18 U.S.C. § 3142(e)(1).

### A.   T. HERNANDEZ IS A FLIGHT RISK.

The Court finds, by the preponderance of the evidence, that T. Hernandez is a flight risk.

He faces charges that carry substantial sentences.  The United States presents weighty evidence of T. Hernandez' guilt.  T. Hernandez has ties to and family in Mexico, where he frequently travels. T. Hernandez has concealed the extent of his travel from pretrial services.  Because of these considerations, the Court finds by a preponderance of the evidence the T. Hernandez is a flight risk.

1.     **The Nature and Circumstances of the Crime Charged Demonstrate T. Hernandez Is a Flight Risk.**

The crime with which T. Hernandez is charged carries substantial penalties.  As presently charged, T. Hernandez is responsible for possessing with intent to distribute 500 and more grams of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B).  This charge carries a minimum sentence of five years, and a statutory maximum sentence of forty years imprisonment under 21 U.S.C. § 841(b)(1)(B)(ii)(II).  The Court concludes that this factor weighs in favor of detention.

2.     **The Weight of the United States' Evidence Against T. Hernandez Shows He Is a Flight Risk.**

Stark's affidavit demonstrates the "the weight of the evidence offered in support of [the charge against T. Hernandez] is significant," giving him ample reason to flee if he is released pending trial.  <u>United States v. Cisneros</u>, 328 F.3d at 618 (recognizing that the United States "need not offer all of its evidence" at the detention stage of the criminal proceeding).  Over the course of two days, law enforcement officers surveilled confidential informants arrange and conduct a transaction with T. Hernandez for 500 grams and more of cocaine.  T. Hernandez participated in negotiations for the sale of the cocaine.  The transactions took place at T. Hernandez' residence in his presence.  The proffered evidence demonstrates the United States' case against T. Hernandez is formidable, making T. Hernandez' conviction and, in turn, his imprisonment, a very real possibility for him.  The risk is high that he will avoid trial by going to Mexico, where he often travels and has family.

3.     **T. Hernandez' History and Characteristics Evidence That He Is a Flight Risk.**

T. Hernandez' history and characteristics cut both ways, but offer further support for finding that he is a flight risk.  Some of his characteristics demonstrate ties to the community.  T. Hernandez is a naturalized citizen.  He has six siblings.  His siblings and parents all reside in New Mexico.  T. Hernandez is married and has three children.  He has a business in Albuquerque.  T. Hernandez has no criminal history related to narcotics trafficking.

On the other hand, although T. Hernandez is a naturalized citizen, he has family in Mexico that he visits at least annually.  He also travels frequently to Juarez.  He has not been forthcoming about the extent of his travel to Mexico.  See United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003)(affirming a detention order where the district court noted, in part, the defendant's "close family in Mexico . . . and that in the past Cisneros has traveled to Juarez with a sister and other family members").  While T. Hernandez alleges he has legitimate income, his records from the New Mexico Department of Labor for 2000 to the present do not show any legitimate income since the second quarter of 2008.  See Tr. at 44:5-45:1 (Ramirez).

In sum, by a preponderance of the evidence, T. Hernandez is a flight risk given the serious penalties he faces, the strength of the United States' case, and T. Hernandez' ties to Mexico.  T. Hernandez has also been less than forthcoming with Pretrial Services and with the Court.  T. Hernandez has significant reason to abscond and avoid incarceration.

**B.     T. HERNANDEZ IS A DANGER TO THE COMMUNITY.**

Because the United States has presented probable cause supporting T. Hernandez' federal charges, the statutory presumption that T. Hernandez poses a danger to the community is triggered.  Even though T. Hernandez has met his burden of production in response to that presumption, the

presumption remains a factor for this Court to consider in making its ultimate determination regarding detention.  See United States v. Stricklin, 932 F.2d at 1355 ("Even if a defendant's burden of production is met, the presumption remains a factor for consideration by the district court in determining whether to release or detain.").  T. Hernandez participated in negotiating the purchase of two kilograms of cocaine.  The transaction occurred at T. Hernandez' residence.  T. Hernandez' role in negotiating and transacting the purchase-price of a large amount of cocaine indicates that T. Hernandez is not a drug trafficking novice.  Thus, beyond the presumption, the federal charges provide reason to deem T. Hernandez a danger to the community.  See United States v. Pina-Aboite, 97 F. App'x at 836 (recognizing that 18 U.S.C. § 3142 "danger-to-the-community factor is not simply about physical violence; the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the community" (citing United States v. Cook, 880 F.2d 1158, 1161 (10th Cir.1989)).  Moreover, T. Hernandez had ten firearms at his home when he conducted the transaction, including six rifles in the backyard where the transaction occurred.  While T. Hernandez has a constitutional right to possess firearms, he does not have a right to possess firearms in the course of a drug transaction.  Consequently, the Court finds that, by clear-and-convincing evidence, T. Hernandez presents a danger to the community.

   **IT IS ORDERED** that the Defendant's Appeal from the Magistrate's Detention Order (Doc. 13), filed March 2, 2011 [Doc. 13], filed March 2, 2011 (Doc. 14), is denied, and Defendant Tayde Hernandez shall be detained pending trial.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Kenneth J. Gonzales
  United States Attorney
Elaine Y. Ramirez
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

Robert J. Gorence
Gorence & Oliveros, P.C.
Albuquerque, New Mexico

       *Attorneys for the Defendant*